IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 
03-0497
════════════
 
Dolores 
Romero, et al., Petitioners
 
v.
 
KPH 
Consolidation, Inc. d/b/a Columbia Kingwood Medical Center, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Fourteenth District of Texas
════════════════════════════════════════════════════
 
Argued September 9, 2004
 
Justice O’Neill, joined by Justice Medina, concurring.
I 
agree with the Court that the evidence is legally insufficient to support a 
malicious credentialing verdict against the Hospital. The peer-review privilege 
prevented the Romeros from knowing what actions the 
Hospital took or failed to take to protect the public from a physician whose own 
former chief of staff, a member of the credentialing committee, thought was a 
menace to patients. While I fully join the Court’s opinion, I write separately 
because I am deeply troubled by the head-in-the-sand approach the various 
hospitals and health-care professionals in this case appeared to take in dealing 
with a drug-impaired physician. Unless health-care institutions and providers 
are in fact, rather than theory, vigilant and proactive in performing the 
critical competence analysis that the peer-review privilege was intended to 
promote, the purposes that prompted the privilege’s creation will prove to be 
illusory. Clearly, the privilege’s purposes were not served in this case.
As 
the Court notes, during Dr. Baker’s initial credentialing and while he 
maintained privileges at the Hospital before Mr. Romero’s grievous injury, the 
Hospital should have learned from its own sources and various others that Baker 
(1) had been sued ten times within an approximate five-year period, (2) was a 
suspected drug addict, (3) had improperly cared for and treated at least four 
named patients, and (4) was suspended from another hospital for operating on the 
wrong leg of a patient, a mistake he had made before. Dr. Ronald Kerr, the 
Hospital’s chief of staff and a member of its executive committee, testified 
that, based on what he had heard and been told, he had formed the view that 
Baker presented a safety risk to patients. But Kerr relied on the State Board of 
Medical Examiners to investigate Baker’s alleged drug use. Baker’s former office 
manager testified that Baker constantly displayed erratic moods and engaged in 
other behavior that should have prompted the health professionals around him to 
take action to protect his unsuspecting patients. According to the record, there 
were numerous warning signs, but there appears to have been a reluctance to 
share vital information.
The 
purposes that underlie the peer-review privilege are commendable and, as our 
opinion today again illustrates, the protection the privilege affords is strong. 
The privilege was designed to foster uninhibited and “exacting critical analysis 
of the competence and performance of physicians and other health‑care providers” 
to improve standards of medical care. Mem’l Hosp.-The Woodlands 
v. McCown, 927 S.W.2d 1, 3 (Tex. 1996). Here, though, 
the Hospital seems to view the privilege as a shield to protect itself from 
injured patients rather than a vehicle for improving patient care; its brief 
castigates the Romeros for “attempt[ing] to get around the privilege with bits and pieces of 
information, rumors, innuendo, gossip, and second-hand information,” even though 
the privilege left the Romeros no other option.
Certainly 
hospitals should be wary of interfering with a doctor’s practice based merely 
upon rumor or innuendo, but neither should they look the other way and refuse to 
heed indications of danger. It has been noted that drug- and alcohol-impaired 
physicians are a growing threat to patients in this country, and the medical 
community’s will to adequately self-police is increasingly the subject of public 
criticism. See, e.g., Thompson, Special Treatment: Disciplining 
Doctors: Medical Boards Let Physicians Practice Despite 
Drug Abuse, Wash. Post, Apr. 
10, 2005, at A1; Sunset Advisory 
Commission, Texas State Board of 
Medical Examiners, Texas State Board of Physician Assistant Examiners, Texas 
State Board of Acupuncture Examiners, Staff Report 1 (Oct. 2004). The Sunset 
Advisory Commission’s recent report evaluating the Board of Medical Examiners 
noted that the use of private rehabilitation orders does not protect the public, 
and recommended that private orders not be used when physicians have violated 
the standard of care. Sunset Advisory 
Commission, supra, at 47. But the same report also noted that the 
Board of Medical Examiners often has difficulty enforcing violations of the 
Medical Practice Act because the peer-review privilege is frequently asserted in 
contested-case hearings. Id. at 41.
The 
Legislature’s primary purpose in conferring the peer-review privilege on 
health-care institutions was to enhance the quality of medical care by 
encouraging forthright and thorough analysis of providers’ competence. And the 
primary purpose in creating exceptions to the privilege that allow disclosure to 
other medical peer-review committees, appropriate state or federal agencies, and 
national accreditation and state licensing bodies, was presumably to encourage 
the free exchange of information between them without losing the protections the 
privilege affords. Tex. Occ. Code § 160.007(c). When doctors and 
hospitals fail to engage in the free exchange of information that the privilege 
was designed to promote, the Legislature’s purpose is thwarted and the 
privilege’s underpinnings erode. Should such erosion become pervasive, the 
privilege deserves to be swept away. 
 
 
_______________________________
Harriet 
O’Neill
Justice
 
 
OPINION DELIVERED: May 
27, 2005